IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KENT PAUL, JAHAEEL HARDY,               )
MARCUS ARNOLD, and CARLOS               )
BARFIELD,                               )
                                        )
                    Plaintiffs,         )        Civil Case No. 06-1603-KI
                                        )
        vs.                             )        OPINION AND ORDER
                                        )
ASBURY AUTOMOTIVE GROUP, LLC,           )
a Delaware corporation, d/b/a           )
THOMASON AUTO GROUP, d/b/a              )
THOMASON TOYOTA,                        )
                                        )
                    Defendant.          )
_____ )

        Aaron W. Baker
        Wm. Keith Dozier, Jr.
        W. Eugene Hallman
        650 Pioneer Tower
        888 SW 5th Avenue
        Portland, Oregon  97204

            Attorneys for Plaintiffs


Page 1 - OPINION AND ORDER

Stephen P. Rickles
The Rickles Law Firm, PC
One SW Columbia Street, Suite 1850
Portland, Oregon  97258-2001

Pamela J. Stendahl
Bodyfelt Mount
707 SW Washington Street, Suite 1100
Portland, Oregon  97205-3528

       Attorneys for Defendant

KING, Judge:

Plaintiffs Kent Paul, Jahaeel Hardy, Marcus Arnold and Carlos Barfield prevailed at trial on their hostile work environment claims under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended.  The jury awarded emotional distress damages in the following amounts:  $1.9 million to Paul, $1.9 million to Hardy, $2.1 million to Arnold, and $2.1 million to Barfield.  Additionally, the jury awarded punitive damages to each plaintiff in the amount of $2.75 million.  Before the court are Defendant's Motion for Judgment as a Matter of Law on Plaintiffs' Hostile Work Environment (#93), Defendant's Alternative Motion for Judgment as a Matter of Law on Plaintiffs' Claims for Punitive Damages (#94), and Defendant's Motion for New Trial or Remittitur (#95).  For the reasons below, I deny defendant's motion for a new trial, conditioned on plaintiffs' acceptance of a remittitur, and deny its motions for judgment as a matter of law.

## LEGAL STANDARDS

I.    <u>Judgment as a Matter of Law</u>

A motion for judgment as a matter of law must be denied, and a jury's verdict must be upheld, if the verdict is supported by substantial evidence.  <u>Wallace v. City of San Diego</u>, 479 F.3d 616, 624 (9th Cir. 2007).  "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion from the same evidence." <u>Id.</u>  The court must review the record as a whole but disregard all evidence favorable to the moving party that the jury is not required to believe.  All reasonable inferences must be drawn in favor of the nonmoving party.  Moreover, the court may not substitute its view of the evidence for the jury's, may not make credibility determinations, and may not weigh the evidence.  <u>Id.</u>; <u>Johnson v. Paradise Valley Unified School District</u>, 251 F.3d 1222, 1227 (9th Cir.), <u>cert. denied</u>, 534 U.S. 1035 (2001).

II.    <u>New Trial and Remittitur</u>

Even if a verdict is supported by substantial evidence, the court may grant a motion for a new trial if it concludes that the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or to prevent a miscarriage of justice.  <u>Silver Sage Partners Ltd. v. City of Desert Hot Springs</u>, 251 F.3d 814, 819 (9th Cir. 2001).  The court may weigh the evidence, may evaluate the credibility of the witnesses, and is not required to view the evidence from the perspective most favorable to the prevailing party.  <u>United States v. Kellington</u>, 217 F.3d 1084, 1095 (9th Cir. 2000).  A new trial is warranted on the basis of an incorrect evidentiary ruling only "if the ruling substantially prejudiced a party." <u>United States v. 99.66 Acres of Land</u>, 970 F.2d 651, 658 (9th Cir. 1992).

In reviewing a jury's damages award, the court may grant a motion for new trial if the award is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Snyder v. Freight, Const., Local No. 287, 175 F.3d 680, 689 (9th Cir.), cert. denied, 528 U.S. 926 (1999).

Remittitur is available to correct excessive verdicts. Pershing Park Villas Homeowners Assoc. v. United Pac. Ins. Co., 219 F.3d 895, 905 (9th Cir. 2000). A trial court reviewing a damages award attacked as excessive must consider the evidence of damages in a light most favorable to the prevailing party. Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir. 1987), amended on other grounds by, 817 F.2d 609 (9th Cir. 1987).

If the court concludes that a damages award is excessive, it may either grant the defendant's motion for a new trial, or deny the motion, conditioned upon the prevailing party's acceptance of a remittitur. Silver Sage, 251 F.3d at 818. A trial court granting a motion for remittitur does not substitute its judgment for that of the jury, but instead reduces the judgment to the maximum amount sustainable by the proof. D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982) (citations omitted).

## DISCUSSION

I.    Motion for Judgment as a Matter of Law on Plaintiffs' Hostile Work Environment Claims

Defendant argues that plaintiffs failed to prove that the slurs, jokes, and other racial comments created a hostile work environment. Specifically, defendant asserts that the conduct occurred rarely, was not physically threatening, and amounted to rude behavior as opposed to severe and pervasive conduct. Defendant also argues that plaintiffs had their best sales during the months the comments were made. Finally, defendant asserts that its remedial measures were

Page 4 - OPINION AND ORDER

prompt and effective and stopped the individual harasser from continuing that behavior.  In short, defendant asserts there was not sufficient evidence to support the jury's verdict in plaintiffs' favor on their hostile work environment claims.

A plaintiff may establish a violation of Title VII or 42 U.S.C. § 1981 by proving that discrimination based on race has created a hostile or abusive work environment.  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986); Johnson v. Riverside Healthcare System, LP, 534 F.3d 1116, 1122 (9th Cir. 2008).  To establish that they were subjected to a hostile work environment, plaintiffs must prove that: (1) they were subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of their employment and create an abusive working environment.  Fuller v. City of Oakland, Calif., 47 F.3d 1522, 1527 (9th Cir. 1995).  The working environment must both subjectively and objectively be perceived as abusive.  Id.

Whether a workplace is objectively hostile is determined based on the totality of the circumstances from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff.  Id.  Some factors include the frequency of the conduct, the severity of the conduct, including whether it was physically threatening, and whether it interfered with the plaintiffs' work performance.  Johnson, 534 F.3d at 1122.  As for comments made by co-workers, defendant will be liable only if it or a member of defendant's management knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment.  Swinton v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001).

Page 5 - OPINION AND ORDER

Plaintiffs presented evidence of comments made by the following supervisors:  Jack Brennan, Sam Kaadi, Kelly Royse, and Scott Caverhill.  In addition, plaintiffs presented evidence of comments made by co-workers Kelly Royse (before his promotion), James Schrimsher, Jack Ford, Colby Fate, and Norine Riddle-LeCroy.[1]  The comments were made from January 2005 to September 2005; the dealership was sold in November 2005.  Some of the plaintiffs learned of some of the comments second-hand and were not the direct recipients of some of the abuse.

Drawing all reasonable inferences in favor of plaintiffs, plaintiffs presented the following evidence:

Brennan, the General Manager of the dealership, called himself a "redneck" repeatedly in meetings when all the plaintiffs were present.  John Donachie, CEO of the company, testified that in June someone reported Brennan's use of the term and Donachie told Brennan to stop. Plaintiffs Paul and Arnold told Brennan on July 28 that they did not like the term.  Brennan admitted he understood it was a racist term in Oregon and yet he used it again the day after plaintiffs complained.  Brennan used the term again on August 2 in a bullying way to another African American salesperson.  That day, four months from his hire date, Brennan resigned rather than be terminated for unrelated reasons.

Kaadi, a "Crew Chief" (also known as an "Assistant Sales Manager"), asked another employee on August 3, "Where is that half-black bastard Jahaeel at?" referring to plaintiff Hardy. Hardy learned of the statement later that day.  The sales manager contacted Human Resources

---

[1]Plaintiffs catagorize Riddle-LeCroy as a supervisor because she was the Internet Manager for the dealership.  Plaintiffs presented no evidence, however, that Riddle-LeCroy was Arnold's supervisor.  See Swinton, 270 F.3d at 803 (company may be vicariously liable for actions of immediate supervisor or someone with successively higher authority).

about giving Kaadi a written reprimand without describing the conduct warranting the reprimand, leaving Human Resources in the dark.  Defendant did not produce the written reprimand at trial. On August 5, Kaadi told plaintiff Barfield that he could not sue his employer just because Brennan called himself a redneck.  He also said African Americans "kill each other and call each other niggers in North Portland."  Barfield asked him to stop, but Kaadi continued by saying, "Segregation still exists; that the poor live on one side of town and the rich on the other; that blacks and whites still live apart."  Kaadi compared it to the Chinese living in Chinatown.  Tr. (8/25/08) 926-27.  Barfield testified that he reported the comment to an assistant sales manager.

A couple of times Kaadi told Hardy that he did not have a claim against their employer. Arnold testified that Kaadi used the word "nigger" on up to six different days.  Tr. (8/21/08) 566, 569.

On September 4, Barfield, Paul and Arnold heard Kaadi say, "Jim Parr is sick, Marcus [Arnold] is sick and Kent [Paul] is a half-black nigger that's sick in the head."  The next day, the new General Manager, Robert Zobrist, accepted Kaadi's resignation before he learned of the comment.  Once he learned of the comment, he told Human Resources that Kaadi was ineligible for rehire.

After learning what Kaadi had said about Paul, Caverhill told plaintiffs, "I agree with Sam [Kaadi], it's true," and then said later he was only joking.  Caverhill learned plaintiffs were upset, and told them he apologized and that, "I get along with black people.  I'm just as black as you are, and if you don't believe me, you can ask my wife" while pointing toward his groin. Caverhill was given a last-chance agreement because of his comments.  There was testimony, however, from a lot manager that in mid-October Caverhill mocked Hispanic customers about

their inability to get insurance.  The lot manager said he informed Zobrist about the incident but Caverhill was not fired.

As a co-worker, in January, Royse shared his disapproval of interracial marriage to another salesperson and Arnold comforted the salesperson.  The General Sales Manager directed Royse to apologize to the salesperson.  Royse repeated his opinion about interracial marriages to Arnold, telling him he thought they were "ridiculous" and "disgusting."  Arnold's children and mother are half-white.  Arnold did not report this incident.  In April, Royse asked plaintiffs how they liked working for "a redneck from Georgia," told them about being beaten up by an African American and that he had been shot by an African American while on a test drive.  He told plaintiffs his parents had been "rednecks" who "burned crosses" and he needed to learn to like African-Americans after growing up in that environment.  The General Sales Manager directed Royse to apologize to plaintiffs.  Barfield described Royse as laughing while he was apologizing.

In June, as a "Crew Chief" over plaintiffs, Royse falsely claimed a customer couple "didn't want to deal" with Paul because he was African American.  After this last incident, Royse was purportedly terminated, but evidence at trial indicated Royse may have been transferred, or at least rehired, at another dealership owned by defendant located across the street.  He was employed there only ten days before he left voluntarily.  On August 5, managers at the dealership asked plaintiffs if they cared if Royse were rehired.  They did and he was not.

Another salesperson, a co-worker of plaintiffs named Schrimsher, refused to stand by Arnold, Barfield and Hardy waiting for customers because he did not want to "eat[] fried chicken and collard greens" and did not want to stand "over there by you black folks."  Tr. (8/21/08) 559:18-21.  Arnold reported the comments to management.  Later that day, Schrimsher told

Page 8 - OPINION AND ORDER

Barfield and Hardy, "Hey, you two niggers–I mean you two negroes–bring your black ass faces over here."  Barfield and Hardy complained and Schrimsher was terminated within half an hour of that complaint.  Brennan told plaintiffs that if someone said anything like this in the future they should just "punch the guy in the face."

Jack Ford, a salesperson at a dealership owned by defendant located next door, came to plaintiffs' dealership in September and told several employees, "All I eat is Viagra and redneck pills!"  He also said that when he worked with Barfield he would let Barfield come in through the "back door" "because he knew that I had my white sheets in my car."  An assistant sales manager was present but did nothing.  When plaintiffs reported the conduct the next day, Human Resources reprimanded Ford and told him to stay away from plaintiffs.  When Ford saw Barfield in mid-November 2005, he said, "I've got to watch what I say around you, but we both know how it is."

Colby Fate, according to Arnold, "boasted about . . . having . . . a Confederate flag when he was growing up and being a redneck, he was proud of it[.]"  Tr. (8/21/08) 556:5-6.  Arnold found his use of the term "redneck" objectionable.  Norine Riddle-LeCroy whispered in Arnold's ear in August, "You know you're my black slave."  Although Arnold did not report these comments to management, they are relevant to the question of whether defendant's remedial actions were effective to stop harassment from occurring in the workplace.

Drawing all reasonable inferences in favor of plaintiffs, I find a jury could conclude the use of  the term "redneck," particularly after learning that plaintiffs considered it offensive, use of the phrases "half-black nigger," "half-black bastard," and "black ass faces," a supervisor's false claim that customers did not want to work with an African American salesperson, insensitive

stereotyping of African Americans, and a reference to "white sheets" constitute "repeated derogatory or humiliating statements" and not casual teasing or offhand comments. McGinest v. GTE Service Corp., 360 F.3d 1103, 1116 (9th Cir. 2004). Supervisors, including the General Manager, made many of the statements. From the perspective of plaintiffs, while some of these "[r]acially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group," from the perspective of an African American the conduct could be perceived as "abusive or threatening[.]" Id.

I reject defendant's suggestion, relying on Wikipedia, that "redneck" does not connote racist beliefs as a matter of law. See Galdamez v. Potter, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005) (term "redneck" "can suggest racial hostility"). The jury could have accepted plaintiffs' testimony that Brennan understood that "in Oregon . . . [the term] means KKK, Confederate flag, you know, white trash, Aryan nation." Tr. (8/21/08) 565:9-10.

Defendant asserts that the conduct occurred rarely. While the comments were somewhat sporadic, they were not rare and occurred often enough that a jury could find that the conduct was sufficiently pervasive to create a hostile work environment.

Furthermore, although each plaintiff did not personally hear all of the comments summarized above, all of the conduct is nonetheless relevant to each plaintiff's claim. Johnson, 534 F.3d at 1123 (comments made when plaintiff not present were relevant to hostile environment claim). Plaintiffs worked under the same supervisors and managers, with the same co-workers, and disclosed the conduct to each other almost immediately after it occurred. Indeed, plaintiffs could perceive comments directed at one of them to be directed at all of them.

In addition, considering the totality of the circumstances, plaintiffs' performance is just one factor. The jury could reasonably conclude that the environment was hostile despite some of the plaintiffs' successful sales performance. Indeed, it is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position." McGinest, 360 F.3d at 1113 (quoting Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994)).

With regard to defendant's remedial actions, although the discipline meted out often stopped the individual harasser, given the spate of continued comments, there is evidence from which the jury could find the remedial measures did not "persuade potential harassers to refrain from unlawful conduct." Ellison v. Brady, 942 F.2d 872, 882 (9th Cir. 1991).

Viewing the evidence in the light most favorable to plaintiffs, I find plaintiffs produced substantial evidence of severe and pervasive conduct of a hostile work environment that defendant did not effectively remedy. Accordingly, I uphold the jury's verdict on liability.

II.    Motion for Judgment as a Matter of Law on Punitive Damages

42 U.S.C. § 1981a(b)(1) allows for the recovery of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Punitive damages may be awarded where an employer discriminates intentionally in the face of a perceived risk that it will violate federal law. Passantino v. Johnson & Johnson Consumer Prod., Inc., 212 F.3d 493, 515 (9th Cir. 2000). The plaintiff must also impute liability to the employer, which can be done by showing a managerial employee acted

Page 11 - OPINION AND ORDER

within the scope of his employment.   <u>Hemmings v. Tidyman's, Inc.</u>, 285 F.3d 1174, 1197 (9th Cir. 2002).

There was evidence Brennan, the General Manager of the dealership, repeatedly referred to himself as a redneck, even after being told that it was offensive to African American employees.  Royse, Kaadi, and Caverhill, all in their capacity as supervisors, made racially offensive remarks.  These were the very employees charged with carrying out the company's anti-harassment policy.

Additionally, while supervisors largely took action as to each individual harasser, the conduct continued to occur giving the jury a basis from which to conclude the company's remedial efforts were inadequate and improperly handled.  <u>See</u> <u>Swinton</u>, 270 F.3d at 811 (low-level supervisor's inaction could make employer subject to punitive damages).  When supervisors learned of inappropriate conduct, they generally did not report it to Human Resources.  The Director of Human Resources testified that Brennan instructed employees not to seek assistance from her and that employees feared retaliation.  She urged the CEO to immediately terminate him, but Brennan was allowed to resign several weeks later for unrelated reasons.  At least on one occasion, an assistant sales manager utterly failed to address a particularly egregious comment about having white sheets in the car.  Defendant could produce no evidence it had given Kaadi a written warning for his "half-black bastard" comment even though a manager told Hardy he would write him up.  Plaintiffs produced evidence Royse was transferred or rehired by the dealership, albeit in a demoted position, that he only left a short time later of his own volition, and that defendant considered rehiring him at the dealership where plaintiffs worked.  Plaintiffs produced evidence the company did not fire Caverhill for making

Page 12 - OPINION AND ORDER

racist remarks, even after he had been given a last-chance agreement. Finally, nobody at the company took steps to openly discuss the issue of racial harassment. See Pavon v. Swift Transp. Co., Inc., 192 F.3d 902, 909 (9th Cir. 1999) (racial slurs and insults were common, management aware and took no meaningful steps to stop it, and never seriously investigated the conduct).

In sum, drawing all reasonable inferences in favor of plaintiffs, they produced substantial evidence adequate to support the conclusion that defendant was recklessly indifferent to the rights of plaintiffs.

III.    Motion for a New Trial or Remittitur

A.    Pretrial Publicity, Voir Dire, and Closing Argument

The day before trial was scheduled to begin, KOIN News lead its six o'clock news broadcast with a two minute, fifty second story about plaintiffs' allegations against defendant, based on a press release from the African American Chamber of Commerce Oregon ("AACCO").[2] The reporter stated that plaintiffs alleged "management used the 'N word' on a regular basis; retaliated against employees who complained about it; and passed over black employees for promotion because of their skin color." Rickles Aff. Ex. 5. A representative from AACCO interviewed for the story stated that defendant should be "out of business" and that racism needed to be "rooted out." Id. He also opined that plaintiffs had a "very good case." Id.

I dismissed all potential jurors who admitted to seeing the broadcast. Additionally, I dismissed others who told me they could not be fair to defendant due to bad car-buying experiences at its dealerships.

---

[2]Hardy's father is an advisory board member for AACCO.

Page 13 - OPINION AND ORDER

No potential juror described the content of the broadcast. I did not seat any jurors who had seen the broadcast. Given the pretrial publicity, I gave defendant the option of filing a motion for mistrial or postponing the trial date for a new panel, and mentioned that the case could be moved to another state. Defendant did not elect any of these options. Similarly, defendant did not request curative instructions with regard to potential jurors' statements about their bad experiences with the dealership. I do not see any reason to grant defendant's motion for a new trial on the grounds of the pretrial publicity or voir dire process.

Defendant contends plaintiffs' attorneys made inappropriate and inflammatory comments during their closing arguments. Defense counsel did not object to these arguments during trial. Although I would have given a curative instruction as to some of the statements plaintiffs' counsel made (e.g. anti-harassment training is not required by law, contrary to plaintiffs' counsel's argument, and I had previously ruled Brennan's statement about Oregonians was inadmissible), I could not say defendant reaches the "high threshold" of showing "the integrity or fundamental fairness of the proceedings is called into serious question." Hemmings, 285 F.3d at 1193 (concern about counsel waiting to raise error until after losing case). If plaintiffs' counsel had not made these statements, I could not say a different verdict would have been likely. I do not grant defendant's motion for a new trial on this ground. Nevertheless, I do consider some of plaintiffs' counsel's statements in evaluating the excessiveness of the emotional distress and punitive damages awards.[3]

_____

[3]For example, plaintiffs' counsel, after stating that he moved from South Carolina to Oregon to "avoid these kinds of things," asserted, "And here it is 2008, and I have to stand before a jury of my peers and my clients' peers and beg you, please do not allow this kind of conduct to continue in my community, in your community, in their community (pointing)." Tr. (8/26/08) 79:19-80:3.

Page 14 - OPINION AND ORDER

B.    <u>Emotional Distress Damages</u>

The jury awarded $1.9 million each in emotional distress damages to Paul and Hardy and

$2.1 million each to Arnold and Barfield.  I find this award to be "grossly excessive or

monstrous, [and] clearly not supported by the evidence. . . ."  <u>Snyder</u>, 175 F.3d at 688.

First, even considering the evidence of damages in the light most favorable to plaintiffs,

the emotional distress they described was fairly minor and was much less than most reported

cases.  Arnold and Paul presented the most extensive testimony about how defendant's conduct

affected them.  Hardy and Barfield offered very little description of their mental and emotional

pain and suffering as a result of defendant's conduct.

Arnold testified about his emotional state as follows:

> I was very stressed out and I didn't do my normal activities.  I would always play
> golf and basketball, things of that nature.  I just lost all desire to do anything.  I
> went into a state of depression.  I was very stressed.  My motivation level went
> down.  My relationship with my kids suffered.  My relationship at work obviously
> suffered as well.  I wasn't able to focus as much on selling cars as I would
> normally would [sic] be able to because the stress level was so high.[4]  I had to – I
> just couldn't concentrate.  My concentration level just went crazy.  My depression
> level went way up.  And my relationship with my friends pretty much deteriorated
> – isolated a lot, didn't eat, couldn't eat.  I mean, it was pretty bad.

Tr. (8/21/08) 582-83.  Arnold's daughter reported that Arnold seemed different, that he had

become a quiet and reserved person, that he lost his appetite, and that he was angry, sad and

depressed.

---

[4]There was, however, evidence that during the worst of the harassment, in July of 2005,
Arnold had his second best month of sales the entire year (he sold 15 cars); furthermore, he sold
14 cars in August of 2005.

Paul testified:

> It was pretty bad, you know.  I was feeling pretty bad, because I had to go home
> every night, you know, talk to my fiancee about it, you know, deal with my
> children all the time.  It was pretty aggravating. . . . I was always in and out of a
> state of depression. . . . Well, whilst we were there, we did go talk to some people
> that we thought could have been, you know, acting as a counselor, at least
> somebody to talk to.

Tr. (8/21/08) 724-25.  Paul's girlfriend testified that he was stressed out during his employment at the dealership and he mentioned that things were uncomfortable at work.  He was furious, upset and "crushed" about being called a "half-black nigger" and "sick in the head," and angry about his manager's reaction.  He got depressed, did not want to leave the house, and was not himself anymore.  Tr. (8/22/08) 790-94.

Hardy testified that the harassment had taken its toll on him.  He took a day off after Kaadi's remark about his being a "half-black bastard."  Hardy's girlfriend, at the time of his employment at the dealership, testified that Hardy closed up, didn't want to talk to her, and isolated himself.  He did not want to go to his girlfriend's parents' house for dinner.  His behavior put a strain on their relationship.  He was angrier and had less patience.

Unlike the other plaintiffs, Barfield did not describe how the remarks affected his physical or emotional state, his relationships, or his stress level.  He reported to Human Resources that he could not finish work shifts and "the air was too thick to work in."  Pls.' Trial Ex. 33 at 19.  His wife testified that Barfield lost his appetite, lost 15 to 18 pounds, suffered from headaches, and withdrew physically and emotionally from her and her son.  His preacher prayed for him in the prayer line.  According to his wife, Barfield did not attend family gatherings and he had trouble sleeping.

Page 16 - OPINION AND ORDER

Considering some of the factors that typically inform a damage award, I note that defendant did not terminate plaintiffs, did not subject them to physical abuse, and none of the plaintiffs described a need for short-term or ongoing psychological counseling of any kind as a result of their experiences at the dealership.  Paul testified to taking antidepressants, but that was seven months after he left the dealership at a time when he had lost his green card and was having marriage problems.  None of the plaintiffs testified that they could not work at the dealership after it changed hands in November, none of them testified to economic difficulties after leaving the dealership, and none of them described any long-term emotional distress.  In fact, Arnold continued to work at the dealership after the transfer in ownership, working among many of the same individuals as before.  In short, none of the plaintiffs had "devoted [their] working li[ves] to the company, only to be callously shown the door, or had [their] career[s] destroyed."  Longfellow v. Jackson County, No. CV 06-3043-PA, 2007 WL 682455, at * 2 (D. Or. Feb. 28, 2007) (remitting emotional distress award from $360,000 to $60,000).

Additionally, looking at the time frame of the conduct in plaintiffs' favor, individuals made comments from approximately January of 2005 through September of 2005, and the dealership changed hands in November of 2005.  At most, plaintiffs were affected by the hostile work environment for eleven months, and suffered the bulk of harassment during six months or so.  This is a considerably shorter time period than the plaintiff in Passantino, who was awarded $1 million for her emotional distress, when she worked for her employer for 18 years and suffered discrimination and retaliation for four years.  Passantino, 212 F.3d 493.  Furthermore, Passantino described anxiety, rashes, stomach problems, constant worry, crying, feeling trapped and upset.  Instead, a case that comes closer to these facts is Swinton, in which the jury awarded

Page 17 - OPINION AND ORDER

plaintiff $30,000, as the only African American to suffer regular racial slurs and racial "jokes,"

including use of the word "nigger" more than fifty times during his six months of employment.

Swinton, 270 F.3d 794.

In sum, I deny defendant's motion for a new trial, conditioned on each plaintiff's

acceptance of a remittitur of the emotional distress damages award to $150,000 for each plaintiff.

     C.     Punitive Damages

The jury awarded each plaintiff $2.75 million in punitive damages, for a total of $11

million.  Defendant argues that the punitive damages awards were so excessive as to warrant a

new trial.  I agree.

The Due Process Clause prohibits the imposition of grossly excessive or arbitrary

punishments on a tortfeasor.  State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 416

(2003).  In reviewing a punitive damages award, a court must consider three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity
> between the actual or potential harm suffered by the plaintiff and the punitive
> damages award; and (3) the difference between the punitive damages awarded by
> the jury and the civil penalties authorized or imposed in comparable cases.

Id. at 418 (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 575 (1996)).

The degree of reprehensibility of defendant's conduct is the "most important indicium" of

the reasonableness of a punitive damages award.  The factors to be considered are whether

(1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an

indifference to or a reckless disregard of the health or safety of others; (3) the target of the

conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated

incident; and (5) the harm was the result of intentional malice, trickery, deceit, or mere accident. Id. at 419.

Although the Court declined to establish a bright-line ratio which punitive damages cannot exceed, it noted that the jurisprudence has established that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425. "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." Id. at 419.

The first Gore guidepost is the degree of reprehensibility of defendant's conduct. The comments were objectionable, but plaintiffs suffered no physical, economic, or severe emotional harm. There was no evidence defendant acted with indifference to the health or safety of plaintiffs and there was no evidence of malice, trickery, or deceit. The comments were spread out over several months. There was no evidence defendant retaliated against plaintiffs for complaining about the conduct. Defendant had an anti-harassment policy in place. Indeed, although substantial evidence supported a finding of reckless disregard, I note that defendant did respond adequately to some conduct. For example, the company made Kaadi ineligible for rehire, and Schrimsher was fired within half an hour of his "black ass faces" comment. Furthermore, after plaintiffs brought their complaints to Human Resources, plaintiffs heard no further racial comments. The awards of $2.75 million for each plaintiff, in conjunction with some of plaintiffs' counsel's statements during closing argument, suggests the jury intended to

punish for conduct beyond this case and may have felt the need to make a statement about discrimination generally.

The second *Gore* guidepost is the disparity between the harm suffered by plaintiffs and the punitive damages award.  Comparing the $2.75 million punitive damages awarded to each plaintiff with the remitted amount of $150,000 for compensatory damages, the ratio between the two is 18:1.  The Court has noted that if the compensatory damages are substantial, a lesser ratio, "perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  State Farm, 538 U.S. at 425.  I consider $150,000 in compensatory damages to be substantial, particularly in light of the fact that plaintiffs suffered no long-term effects and the damages are based on emotional harm, something not easily quantified.  See Bains, LLC v. Arco Products Co., 405 F.3d 764, 776 (9th Cir. 2005) ($50,000 economic damages award was substantial).  This factor counsels reducing the punitive damages.

The third *Gore* guidepost, civil penalties in comparable cases, allows the court to consider the statutory caps on punitive damages in Title VII cases.  Congress identified $300,000 as the maximum amount of punitive damages allowable for Title VII violations.  In a § 1981 case, the Ninth Circuit reduced a punitive damages award of $5 million to between $300,000 and $450,000 (nine times the economic damages), noting specifically the $300,000 statutory limitation on punitive damages awards.  Bains, 405 F.3d at 777 ("$300,000 statutory limitation on punitive damages in Title VII cases was an appropriate benchmark for reviewing § 1981 damage awards, even though the statute did not apply to § 1981 cases.").

After considering the *Gore* guideposts, I conclude that the punitive damages must be reduced to $150,000 for each plaintiff to comport with due process concerns.

Since I find that the punitive damages awards are excessive under the Due Process

Clause, I need not consider defendant's argument that Exxon Shipping v. Baker, 128 S. Ct. 2605

(June 25, 2008) obviates the due process analysis.  Defendant asserts that the availability of

punitive damages under plaintiffs' § 1981 claim is a judicially created remedy, like that provided

by the federal maritime common law in Exxon.  Under Exxon, in maritime cases involving a

similar level of reckless misconduct as at issue here (according to defendant), the ratio of

punitive to compensatory damages should not exceed a 1:1 ratio and should more likely fall in

the range of 0.65:1.  The Ninth Circuit, however, recently refused to "fashion a federal common

law rule of reasonableness for punitive damage awards" in a § 1983 case where it had already

concluded that the award was excessive under the due process clause.  Mendez v. County of San

Bernardino, 540 F.3d 1109, 1122-23 (9th Cir. 2008).  Without authority requiring that I impose an

Exxon-type ratio in reducing the punitive damages here, I follow the Ninth Circuit's lead in

Mendez.

Accordingly, I deny defendant's motion for a new trial, conditioned on each plaintiff

accepting a remittitur of the punitive damages award to $150,000 for each plaintiff.

D.    Kolstad Instruction

Defendant alternatively argues that it is entitled to a new trial on punitive damages

because I erred in failing to give an instruction to the jury on defendant's affirmative defense

under Kolstad v. American Dental Ass'n, 527 U.S. 526, 542-43, 545-46 (1999).  Pursuant to

Kolstad, "an employer may not be vicariously liable for the discriminatory employment decisions

of managerial agents where those decisions are contrary to the employer's 'good faith efforts to

comply with Title VII.'"  Id. at 545.  Defendant proposed a jury instruction based on this

statement of the law, which it labeled Requested Instruction No. 20.  The night before instructing

the jury I gave the attorneys a copy of my proposed instructions, which did not include

defendant's Instruction No. 20, and requested that they look them over that night and give me

feedback in the morning.[5]  Defendant failed to object to the absence of its Instruction No. 20.

Pursuant to Federal Rule of Civil Procedure 51, defendant failed to preserve its objection.

Nevertheless, "[a] court may consider a plain error in the instructions that has not been preserved

as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P. 51(d)(2).  It

was error to fail to give the instruction defendant requested and it affected defendant's substantial

rights.  Plaintiffs never objected to the instruction.  If defendant had brought the error to my

attention, I would have given an instruction like defendant's Instruction No. 20.  The jury could

have found, despite the bad acts of defendant's managers and supervisors, that defendant should

not be punished because the defendant attempted in good faith to prevent discrimination.

I am not as convinced as defendant that it would have been successful in defeating

plaintiffs' claims for punitive damages.  Even low-level supervisors and managers' actions may

subject an employer to punitive damages liability if the supervisor or manager was responsible

for remedying the harassment.  See Swinton, 270 F.3d at 810 (low-level supervisor's inaction

could make employer subject to punitive damages).  The anti-harassment policy directed

employees to report incidents to a "manager or Human Resources," and "any supervisor or

manager who receives such a complaint must report it to the dealership General Manager and

Human Resources immediately."  Ex. 105 at A/TT-00127.  Accordingly, Brennan, Kaadi, Royse

---

[5]Accordingly, I satisfied the requirement that I "inform the parties" of the proposed
instructions and of my "proposed action on the requests" before instructing the jury.  Fed. R. Civ.
P. 51(b)(1).

Page 22 - OPINION AND ORDER

and Caverhill would all qualify as managers who took part in the harassment and failed to discourage continued harassment.

In addition, defendant relies on its mandatory anti-harassment training program, its "zero tolerance" policy, and its toll free 800 number as evidence of its good faith efforts. However, "it is well established that it is insufficient for an employer simply to have in place anti-harassment policies; it must implement them." Swinton, 270 F.3d at 810-11. Here, there was evidence from which the jury could conclude that Brennan, the General Manager of the dealership and one of many people responsible for remedying claims of harassment, continued to use the word "redneck" even after he knew it was offensive to African Americans. The jury could conclude that managers only sporadically reported conduct and comments to Human Resources, sometimes well after the event, that Brennan and others dissuaded plaintiffs from seeking assistance from Human Resources on their own, and that the company's efforts to stop harassment were insufficient to discourage other harassers. In sum, there may have been sufficient evidence to defeat defendant's affirmative defense. Nevertheless, defendant should have been given an opportunity to argue it. As a result, my failure to give an instruction based on Kolstad is an alternative ground to deny defendant's motion for a new trial, conditioned on each plaintiff accepting a remittitur of the punitive damages award to $150,000 for each plaintiff.

## CONCLUSION

Defendant's Motion for Judgment as a Matter of Law on Plaintiffs' Hostile Work Environment (# 93) and Defendant's Alternative Motion for Judgment as a Matter of Law on Plaintiffs' Claims for Punitive Damages (# 94) are denied. Defendant's Motion for New Trial or Remittitur (# 95) is denied, conditioned on plaintiffs' acceptance of the remitted damages

awards.  Plaintiffs are entitled to an award of compensatory damages in the amount of $150,000

each.  Plaintiffs are entitled to a punitive damages award of $150,000 each.  Plaintiffs are

directed to individually evaluate whether they accept the remitted compensatory and punitive

damages awards or whether they wish to proceed to trial on defendant's liability for punitive

damages and their emotional distress damages.  The Court will schedule a telephone conference

in the near future.

      IT IS SO ORDERED.

      Dated this _____23rd_____ day of January, 2009.


              ___/s/ Garr M. King_____
              Garr M. King
              United States District Judge